**SACK & SACK, LLP**
110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax:  (212) 702-9702

JUDGE STEIN

15 CV 1108

RECEIVED
FEB 17 2015
U.S.D.C. S.D.N.Y.

*Attorneys for Plaintiff, Nicholas O'Grady*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

**NICHOLAS L. O'GRADY,**

                  Plaintiff,

— against —

**BLUECREST CAPITAL MANAGEMENT LLP,**

                  Defendant.

**Civ No.** _____

**COMPLAINT**

JURY TRIAL REQUESTED

------------------------------------------------------------ x

Plaintiff, Nicholas L. O'Grady ("*O'Grady*" or "*Plaintiff*"), by his attorneys Sack & Sack, Esqs., as and for his Complaint against BlueCrest Capital Management LLP ("*BlueCrest*" or "*Defendant*"), alleges as follows:

## NATURE OF ACTION

1.     O'Grady is a senior level executive and extremely well-respected manager and investor with an impressive track record in the Hedge Fund Industry for over ten (10) successful years.

2.     After a previous failed attempt to expand its US equity business,

BlueCrest hired O'Grady in part to take full advantage of his stellar industry reputation, investment expertise and his ability to help lend credibility to their platform and to encourage other managers to join.

3.      Throughout his tenure at BlueCrest, O'Grady was a consistently instrumental employee and an energetic, intelligent, motivated and committed contributor to BlueCrest's business, whose performance at BlueCrest can be characterized as exemplary.

4.      O'Grady's claims involve BlueCrest's intentional and willful misrepresentations made to O'Grady in order to induce him to accept employment at BlueCrest and then failing to adhere to its previously promised contractual obligations to O'Grady.

5.      As more fully set forth herein, this dispute emanates from BlueCrest's efforts to, in bad faith, avoid its contractual obligations to pay O'Grady his earned, owed, promised express contractual compensation (i.e., commissions) in respect of the work, labor and services he personally performed on BlueCrest's behalf.

6.      In sum, O'Grady's claims include:

        (a)      BlueCrest's bad faith failure and refusal to pay O'Grady an appropriate 2014 commission; and

        (b)      BlueCrest's bad faith failure and refusal to pay O'Grady appropriate severance pay.

7.      **2014 Commission** – O'Grady is due one million, two hundred eighty four thousand, six hundred and fifty two dollars (**$1,284,652**), which amount represents his contractual commissions earned while at BlueCrest through June 4, 2014.

8.     **Severance Pay Package** - O'Grady is owed his agreed upon and appropriate amount of severance pay due him upon his termination without cause, equal to twenty thousand, eight hundred thirty three dollars (**$20,833**), which is equal to one (1) month of salary.

9.     BlueCrest has failed to pay O'Grady the compensation due him, which failure is willful.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as this action is between a plaintiff, a resident of Connecticut, and Defendant, a foreign company doing business in New York, where the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.    This Court has personal jurisdiction over defendant by virtue of their activities within this State and this District under New York Civil Practice Law and Rules Rule 301.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

12.    Furthermore, Plaintiff's Employment Agreement specifies:

> 15.2. ALL PARTIES HERETO, INCLUDING BLUECREST UK, AGREE THAT ANY ACTION OR PROCEEDING AGAINST THE PARTIES RELATING IN ANY WAY TO ANY OF THE RELATED AGREEMENTS (WHETHER IN LAW OR IN EQUITY, WHETHER IN CONTRACT, TORT OR OTHERWISE) MUST BE BROUGHT AND ENFORCED EXCLUSIVELY IN THE COURTS OF THE STATE OF NEW YORK OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF THE STATE OF NEW YORK...

## PARTIES

13.    Plaintiff, Nicholas L. O'Grady, currently resides at 85 West Hills Road,

New Canaan, Connecticut 06840, Fairfield County.

14.     BlueCrest Capital Management, LLP maintains its corporate headquarters at Rue Vallin 2, 1201 Genève, Switzerland, and it has a New York office located at 575 Park Avenue, 9th Floor, New York, New York 10153.

**FACTS[1]**

The claims set forth herein arise from the following set of facts:

**O'GRADY'S BACKGROUND**

15.     In 2000, O'Grady graduated from Bowdoin College with a Bachelor of Arts (BA) degree in both History and Economics.

16.     From 2000 – 2002, O'Grady was employed as an Investment Banking Analyst at Banc of America Securities, LLC, where he worked on a variety of M&A and capital raising transactions in both the Global Natural Resources Group as well as the General Industrial Group.

17.     In 2003, O'Grady served as an Associate in Jefferies & Co.'s Investment Banking division as a generalist, working on restructurings, M&A, and capital raising before leaving for the buy-side.

18.     In late 2003, O'Grady entered the hedge fund business as an energy and utilities analyst for a Portfolio Manager at both Jemmco Capital, LLC and, later, Sandell Asset Management Corp. ("*Sandell*"). O'Grady's team was highly successful and grew from $200 million in gross capital to over $700 million by the end of his tenure.

---

1. All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.



O'Grady also was solely responsible for numerous Master Fund positions taken by the founder, including one in which Sandell began "Activist" proceedings.

19.     In late 2006, O'Grady was recruited by Highbridge Capital Management, which at that time was the largest hedge fund manager in the world, to launch a global natural resources fund.  Highbridge had recently purchased Louis Dreyfus and was looking to expand into commodities and linked equities.

20.     At Highbridge, O'Grady's team was highly successful, starting with seed capital of $150 million and growing it to over $1.1 billion at the peak of the markets in 2008.

21.     In 2009, O'Grady was recruited and hired by a start-up fund, Plural Investments, LLC ("*Plural*"), where he was their top performing manager throughout his tenure. Despite O'Grady's successes at Plural, the firm was struggling from issues having nothing to do with O'Grady's performance, forcing O'Grady to seek other employment.

22.     O'Grady was flooded with several employment offers due to his strong track record.  In less than one week, SAC Capital ("*SAC*") made O'Grady an offer. This was followed by a very aggressive offer from Angel Lane Strategies, a division of Nomura Asset Management, which was being built out by ex-Millennium manager Jonathan Larkin ("*Larkin*").

23.     Ultimately, O'Grady went to SAC, where he continued to generate solid returns.  He also became a meaningful contributor to SAC's "Cohen" Account, or center book, ranking amongst the top contributors at the firm.

**O'GRADY IS HEAVILY RECRUITED BY BLUECREST**

24.     In June 2013, O'Grady was contacted by Zachary White ("*White*") of

Attica Executives, a head-hunting firm retained by the British financial services fund, BlueCrest. At that time, White informed O'Grady that Larkin had joined BlueCrest from Nomura as Head of Equities, and was now looking to build out a large multi-strategy, industry-focused equities business.

25.     At the time, BlueCrest was largely unknown in the U.S. investment community and, to the extent that people had heard of BlueCrest, they were skeptical of its ability to create a multi-manager platform that could compete with large U.S. hedge funds.

26.     Previously, BlueCrest had built out an equities business but had been forced to shut it down.

27.     White made it clear to O'Grady that BlueCrest now needed someone with a very impressive track record and reputation in the long/short equities business to **"build a case for attracting top-tier talent and a sustainable platform."**

28.     By this time in 2015, recognizing that SAC's publicized legal problems could adversely impact his first professional upward trajectory, O'Grady sat down with Larkin at BlueCrest's New York offices and discussed the BlueCrest opportunity.

29.     O'Grady suggested to Larkin that they wait and see what happened at the end of the year for SAC, as O'Grady did not want to forego his compensation or deferrals from SAC until he received his 2013 compensation. Larkin informed O'Grady he would remain highly interested and would await further instruction.

30.     The BlueCrest opportunity was a perfect fit for O'Grady and was a natural step in his career growth where he would be able to use his experience in running equity funds to build a business, with the significant financial backing of an established hedge

fund based in the United Kingdom.

31.     In October 2013, Larkin explained to O'Grady a build-out plan that was well-defined and clearly involved the following:

(a)     BlueCrest needed to build the business and create a presence in the United States;

(b)     BlueCrest wanted to hire O'Grady because of his track record, management skills and unblemished reputation in the hedge fund field;

(c)     BlueCrest needed credibility and a reputation in the U.S.;

(d)     BlueCrest would provide capital for O'Grady to build the business in the United States, and would "be disappointed if he was not managing $1 billion by the end of the year";

(e)     BlueCrest had failed in its previous attempt at the equities business and needed to put its investors' money to work, which, until now, was suffering from low to negative returns in their existing strategies;

(f)     O'Grady's title at BlueCrest was to be Portfolio Manager, Equities;

(g)     O'Grady would report directly to Larkin; and

(h)     O'Grady would be the largest equity allocation in the US, with sole decision-making authority to run his fund, fitting within BlueCrest's overall risk management limits.

32.     Most important, in order to fully incentivize O'Grady, Larkin promised O'Grady that his bonus compensation will be expressly linked to his personal performance.

**O'GRADY'S HIRING**

7

33.     In or around October 2013, O'Grady met with internal SAC management, where he was informed that he was free to leave and join a new firm.  O'Grady contacted Larkin the same day and suggested they meet again.

34.     A few days later, O'Grady again met with Larkin at BlueCrest's New York City offices.  Larkin informed O'Grady that, due to prior due diligence from Nomura and O'Grady's solid track record, "**We are prepared to move very quickly and make a competitive offer.  I can offer a 18% payout on your personal performance and an initial $400 million in Gross Capital with no problem.**"

35.     On or around October 31, 2013, O'Grady received a written offer letter from BlueCrest (Ex. A, the "*Employment Agreement*"), as well as confirmation on a fixed 18% commission on gross profits he generated, less direct trading expenses, which O'Grady previously discussed with Larkin (Ex. B).

### BLUECREST'S WRITTEN PROMISES OF COMMISSION COMPENSATION

36.     Pursuant to the Employment Agreement, O'Grady was hired as a Portfolio Manager.  (Ex. A, ¶ 1.)

37.     According to the Employment Agreement, O'Grady's compensation was made up of two (2) components:  (a) an annual base salary of $250,000 (Ex. A, ¶ 2); and (b) participation in "any bonus programs the Company may decide to establish from time to time to cover employees similarly situated to you, subject to the provisions of the applicable bonus program." (Ex. A, ¶ 3).

38.     On or around the same day BlueCrest entered into the Employment Agreement with O'Grady, O'Grady was provided with the written "bonus program,"

which was specifically referred to in the Employment Agreement. (See, Ex. B)

39.     The bonus program, entitled  "Equities Compensation Model", confirms that O'Grady would be paid 18% of is personal performance P&L (the "*P&L Commission*").  The P&L Commission given to O'Grady in writing is consistent with the commission compensation promised to him by Larkin as an inducement to joining BlueCrest and performing his duties under the Employment Agreement.

40.     The Equities Compensation Model set forth specific details of how O'Grady's P&L Commission would be calculated based upon his personal performance.

41.     Because the "bonus program" referred to in the Employment Agreement was confirmed by the Equities Compensation Model, which confirms the means of measuring the amount of O'Grady's P&L Commission compensation in respect of his labor and services, which is directly tied to his personal performance, the P&L Commission earned by O'Grady pursuant to the Equities Compensation Model is considered non-forfeitable "wages" under New York's Labor Law.

42.     Further confirmation that O'Grady's "bonus" was considered a commission, even according to BlueCrest, is BlueCrest's deduction of O'Grady's base salary from the calculation of O'Grady's P&L Commission.  (See, Ex. B)

### O'GRADY'S PERFORMANCE

43.     On December 2, 2013, O'Grady began working at BlueCrest.

44.     O'Grady quickly got up to speed and began to prepare for the launching of the new fund.  Around mid-December 2013, O'Grady began deploying capital.

45.     Despite deploying less than $100 million by the end of 2013, O'Grady still managed to generate approximately $570,000 in profits by year end.

46.     In or around January 2014, O'Grady received his payout "GUARANTEE" by email based on his profits, consistent with the agreed 18% rate as set forth on the Equities Compensation Model.

47.     The email specified the following:

-----Original Message-----

From: Dafydd Jones
Sent: Friday, January 17, 2014 01:19 PM GMT Standard Time
To: Nicholas O'Grady
Cc: Jonathan Larkin
Subject: Comp Calcs

Nicholas,

Please find attached your latest comp file.

I have also attached a file detailing your team's salary and **guarantees**. Please can you populate this file with any proposed discretionary awards for your team and return to me on Monday.

Let me know if you have any questions.

Many thanks,
Daf

Dafydd Jones
Head of Management Information

BlueCrest Capital Management (UK) LLP
40 Grosvenor Place, London, SW1X 7AW, United Kingdom
T +44 (0)20 3180 3635  I  BB +44 (0) 77 9884 3266
E          dafydd.jones@bluecrestcapital.com          I          W
www.bluecrestcapital.com




|  |  | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**OGRADN** | Nicholas O'Grady

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD | Projected FY 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Trader P&L** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 582,777 | 582,777 |  |

**Less Direct Costs**

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD | Projected FY 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Brokerage |  |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
| Financing/PB |  |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
| Research |  |  |  |  |  |  |  |  |  |  |  |  |  | 0 |
| Bloomberg Terminals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8,408 | 8,408 |  |
| Fixed Assets | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Business Travel | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| **Net Trader P&L** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 577,371 | 577,371 | 0 |
| **Gross Award**    12% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 103,927 | 103,927 | 0 |

**Less Other Costs**

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD | Projected FY 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basic Salary | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,833 | 20,833 |  |
| (U/S & Permanent Health Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Employer's Social Security (US) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,293 | 1,293 |  |
| Employer's Medicare (US) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 302 | 302 |  |
| Relocation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Health Centre and Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Training | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| BUPA/Cigna Healthcare costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Exam Costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| **Staff Expenses Total** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 22,428 | 22,428 | 0 |
| Bloomberg Realtime | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| NYSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Global Metro | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| OPRA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Matlab | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| TMX Montreal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| **Market Data/Services Total** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Travel - taxis | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Accommodation & Subsistence | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| **Travel & Entertaining Total** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Communications | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Other Legal and Professional | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Bank Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| **Other Total** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Servers |  |  |  |  |  |  |  |  |  |  |  |  | 0 |  |
| Front Arena (Analysis) |  |  |  |  |  |  |  |  |  |  |  |  | 0 |  |
| Quad-Core Workstation |  |  |  |  |  |  |  |  |  |  |  |  | 0 |  |
| **Non-Standard IT Total** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Analyst Costs** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 25,173 | 25,173 |  |
| **Quant R&D Share** |  |  |  |  |  |  |  |  |  |  |  |  | 0 |  |
| **Total Other Costs** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 47,602 | 47,602 | 0 |
| **Trader Award** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 56,325 | 56,325 | 0 |
| **Employee Team** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -832 | -832 |  |
| **Net Trader Award** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 55,493 | 55,493 | 0 |

**Analyst Costs**

**59872L** | Ladd Fritz

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD | Projected FY 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basic Salary | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,500 | 12,500 |  |
| BUPA/healthcare Costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Employer's N.I. - Basic Salary | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Employer's Pension Contributions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Relocation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Health Centre and Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Training | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| BUPA/Cigna Healthcare costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Exam Costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| **Staff Expenses Total** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,500 | 12,500 | 0 |
| Bloomberg Anywhere | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Bloomberg Realtime | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| **Market Data/Services Total** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Front Office Business Applications | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Communications | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| **IT & Communications Total** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Printing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 87 | 87 |  |
| Tax Advice | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Subscriptions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| **Other Total** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 87 | 87 | 0 |
| **Total Analyst Costs** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,587 | 12,587 | 0 |

**Analyst Costs**

**LJPOV5** | Eugene Lipowetski

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD | Projected FY 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basic Salary | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,500 | 12,500 |  |
| BUPA/healthcare Costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Employer's N.I. - Basic Salary | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Employer's Pension Contributions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Relocation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Health Centre and Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Training | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| BUPA/Cigna Healthcare costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Exam Costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| **Staff Expenses Total** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,500 | 12,500 | 0 |
| Bloomberg Anywhere | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Bloomberg Realtime | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| **Market Data/Services Total** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Front Office Business Applications | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Communications | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| **IT & Communications Total** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Printing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 87 | 87 |  |
| Tax Advice | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Subscriptions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| **Other Total** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 87 | 87 | 0 |
| **Total Analyst Costs** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,587 | 12,587 | 0 |

48.     In 2014, O'Grady's success continued.

49.     O'Grady's fund generated significant returns of over $7 million over the first two months while still deploying just $100 million in capital into investment positions.

50.     In May 2014 and early June 2014, the portfolio continued to be profitable, and Larkin increased O'Grady's allocation by an additional $100 million.  Larkin told O'Grady that by July 2014 he also planned to provide further capital for a "carve-out" for O'Grady's analysts to manage a small portion, as O'Grady had requested. Larkin told O'Grady, "**Right now you are at the maximum size I can allow as a percentage of the overall fund.**"

51.     By June 2014, O'Grady's fund was far and away the best performing fund at BlueCrest, with equity returns nearing 7% in fewer than six months.  This was with a portfolio that was generating returns at 2 times the value at risk.

52.     During this time, O'Grady received numerous praises from BlueCrest Management, including Larkin as well as his London based counterpart, Christian Dalban ("*Dalban*"), Principal of the BlueCrest Equity Strategies Fund in London.  O'Grady was also invited to sit down with Andrew Dodd, BlueCrest's senior partner and CFO, to discuss the vision of "backing their winners" and building the franchise around people like him.  The goal of the meeting was both to praise O'Grady for his early successes and to explain that the fund was to be built and scaled up around people like him, rather than the model of continuing to add overlapping managers in the same sectors, as many other multi-manager models had done.




### O'GRADY EARNS HIS 2014 COMMISSION DESPITE TERMINATION

53.     On or around June 4, 2014, BlueCrest terminated O'Grady's employment without cause.

54.     Through the date O'Grady's employment with BlueCrest was terminated, O'Grady unequivocally earned P&L Commission of $1.284 million.

55.     Under O'Grady's direction and management, BlueCrest had steadily increased their capital allocation to his team due to stellar and consistent performance.

56.     Throughout 2014, O'Grady continued to build the reputation of BlueCrest in the U.S. market, putting them in a position of getting respect as a legitimate player in the long/short multi-strategy market. As a result, BlueCrest was getting focused attention from the sell-side above where their commission levels would garner.

57.     Also throughout 2014, O'Grady continued to help Larkin build out the team in New York via numerous efforts to solicit potential candidates for hire.

58.     Over the tenure of his employment with BlueCrest, O'Grady had personally generated over $9.2 million in profit.

59.     In 2014 alone, O'Grady generated $8.625 million of profit, which, at his 18% commission less expenses, equates to no less than $1.284 million in commission (i.e. "wages") due and owing to O'Grady.

60.     Also as a consequence of his termination without "cause", O'Grady is entitled to BlueCrest severance of $20,833, which BlueCrest has refused to pay.

## SUMMARY OF CLAIMS

61.     As a result of his termination, O'Grady is owed at least **$1,305,485** in respect of at least the following earned but unpaid compensation (the "*Accrued Obligations*"), of which O'Grady was paid zero:

(i)     **$1,284,652**, which represents O'Grady's 2014 P&L Commission; plus

(ii)    **$20,833**, which represents O'Grady's entitlement to BlueCrest severance payments.

## CLAIMS AND DAMAGES

Based upon the above allegations, Plaintiff maintains the following legal claims against Defendant:

## COUNT ONE
### (Breach of Contract)

62.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

63.     As of the date of this Complaint, Defendant remains in material breach of contract in respect of Plaintiff's Accrued Obligations, as more fully described herein.

64.     Despite verbal and written demands, Plaintiff was not paid any portion of the earned Accrued Obligations duly owed to him.

65.     Plaintiff was not paid any portion of the Accrued Obligations, which is unprecedented by Defendant's policies, practices and procedures, despite a combination of:

a.   the parties' written agreements;

      b.  the parties' prior and prospective conduct and course of dealings and payment to other similarly situated employees;

      c.  numerous express verbal promises and representations made to and reasonably relied upon by Plaintiff by those agents of Defendant in authority during the course of Plaintiff's employment with Defendant; and

      d.  Defendant's legal obligation to obey the implied covenant of good faith and fair dealing applicable to all employers in the state of New York.

66.    Plaintiff is unquestionably qualified to receive the Accrued Obligations promised to him, under the express conditions previously agreed to between Plaintiff and Defendant.

67.    Accordingly, Plaintiff is owed and entitled to receive an amount of at least **$1,305,485** in respect of his Accrued Obligations.

## COUNT TWO
### (Breach of Implied Contract)

68.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

69.    Even without an express written or oral agreement specifying the exact terms of Plaintiff's compensation, there exists an implied contract to pay the amounts previously delineated herein and otherwise due and owing to Plaintiff.

70.    Accordingly, based upon the prior conduct and "course of dealing" between Plaintiff and Defendant as well as Defendant's practices of paying Plaintiff and

similarly situated agents or employees certain compensation, an implied contract exists in respect of the compensation, of which Plaintiff was paid zero.

71.     Plaintiff has been caused thereby to suffer damages in amount of not less than **$1,305,485**, in respect of his Accrued Obligations.

## COUNT THREE
### (Quantum Meruit – Unjust Enrichment)

72.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

73.     Defendant promised to pay Plaintiff certain compensation for the work, labor and services provided with respect to his employment, which is usual and customary as and for the reasonable value of services rendered and to-be-rendered for the foreseeable future.

74.     Plaintiff performed the services required to perform services with the full expectation of receiving the compensation promised to him that is described hereunder, which what was reasonable, fair and customary, as compared with what was paid to similarly situated employees performing substantially the same work in which Plaintiff was engaged.

75.     Plaintiff fully performed all of his obligations and "but for" the unlawful termination, would have continued to perform all of his obligations for the foreseeable future.

76.     Defendant failed and refused to pay to Plaintiff compensation, which was fair and customary.

77.     Defendant's conduct with respect to Plaintiff is actionable as a breach of contract based upon Quantum Meruit under New York's quasi contract law.

78.     Plaintiff has been caused thereby to suffer damages in amount of not less than **$1,305,485**.

## COUNT FOUR
### (Promissory Estoppel)

79.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

80.     Plaintiff is entitled, under the doctrine of promissory estoppel, to compensation for the work, labor and services provided to Defendant in respect of his employment, which relationship would have continued for the foreseeable future.

81.     Defendant, through its agents, made a clear and unambiguous promise to Plaintiff, upon his agreement to remain employed with Defendant, that Plaintiff would be unconditionally paid his Accrued Obligations.

82.     In reasonable reliance upon the numerous unequivocal and express verbal promises, representations and guarantees made to and relied upon by Plaintiff to his detriment by those agents of Defendant in authority during the course of Plaintiff's employment, Plaintiff continued to remain employed with Defendant through the date of his termination.

83.     Defendant made certain unequivocal and express verbal promises, representations and guarantees to and relied upon by Plaintiff to his detriment in order to induce him to remain with Defendant.

84.     Such reliance by Plaintiff was reasonably foreseeable at the time Defendant and its agents made these promises.

85.     Courts have found that if there comes a time when a party makes an unambiguous promise to another and that party reasonably and foreseeably relies upon that promise, it is unconscionable to allow that party nothing.

86.     Accordingly, Plaintiff reasonably relied to his detriment on the above-mentioned promises and representations made by Defendant.

87.     Plaintiff has been injured by reason of his reliance on the foregoing representations and promises of Defendant, in the amount equal to at least the value of his Accrued Obligations of **$1,305,485**.

## COUNT FIVE
### (Labor Law)

88.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

89.     Defendant herein is an "employer," as that term is defined in the applicable NYS Labor Law.

90.     At all material times herein, Plaintiff was an "employee," as that term is defined in the applicable NYS Labor Law.

91.     New York Labor Law § 193 (McKinney's Cons Laws of New York, Book 30) provides: "no employer shall make any deduction from the wages of an employee" and "no employer shall make any charge against wages, or require an employee to make any payment by separate transaction."

92.     Defendant has unlawfully made deductions from Plaintiff's earned compensation.

93.     Defendant is therefore liable to Plaintiff under Labor Law § 193 and Plaintiff is entitled to costs, together with reasonable attorney's fees.

94.     In addition, Defendant's violation of § 193 was willful.

95.     Accordingly, Defendant, in addition to its liability for costs and attorney's fees as aforesaid, are liable under Labor Law § 193 and for statutory penalties equal to 100% of all applicable wages.

## COUNT SIX
### (Breach of Covenant of Good Faith and Fair Dealing)

96.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

97.     Implicit in the dealings, agreements and understandings between Plaintiff and Defendant is a covenant of good faith and fair dealing.

98.     The covenant of good faith and fair dealing requires that Defendant not take any action which will have the effect of destroying Plaintiff's rights to receive fair compensation and promised financial benefits for his work, labor and efforts on behalf of Defendant.

99.     By failing to properly and fairly compensate Plaintiff in respect of his work, labor and efforts exerted on behalf of Defendant and in respect of the Defendant's benefit of such work, labor and efforts, Defendant has breached the implied covenant of good faith and fair dealing.



100.    Defendant's deliberate firing of Plaintiff for the sole purpose of avoiding the payment of his fully earned and contractually owed bonus is a clear breach of the implied covenant good faith and fair dealing.

## COUNT SEVEN
### (Action For An Accounting)

101.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

102.    At all relevant times, Defendant owed Plaintiff a fiduciary duty.

103.    Defendant is wrongfully in possession of monies and property and possesses documents beyond what information Plaintiff already has, which imposes a burden upon Defendant for an accounting.

104.    Plaintiff has no adequate remedy of law and will suffer irreparable harm unless an accounting is ordered.

105.    Based upon the foregoing, Plaintiff seeks and is entitled to an accounting of all monies, property, funds and assets maintained by Defendant to determine the value of Plaintiff's Accrued Obligations.

106.    Upon such accounting, Plaintiff is entitled to a money judgment against Defendant in the amount so determined.


## ATTORNEY'S FEES AND COSTS

107.    Attorney's fees and costs are warranted in this matter as the undersigned, on behalf of Plaintiff have in good faith, attempted to negotiate a reasonable resolution

with Defendant without having to refer this matter to this forum for adjudication, determination and final resolution on the merits.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I.     On all Counts, an amount of not less than **$1,305,485,** plus interest and costs;

II.    Grant Plaintiff damages pursuant to applicable NYS Labor Law, plus liquidated damages because of Defendant's willful violation of NYS Labor Law, plus interest, attorneys' fees and costs;

III.    An accounting to determine Plaintiff's commissions;

IV.    An award of prejudgment interest, costs, punitive damages (where applicable) and attorney's fees; and

V.    Such other and further relief that this Court may deem just and proper.

Dated: New York, New York
       February 17, 2015

Respectfully submitted,

**SACK & SACK, ESQS.**

By: _____
     Jonathan Sack, Esq.

**Attorneys for Plaintiff**
**NICHOLAS O'GRADY**
110 East 59th Street, 19th Floor

New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702

**EXHIBIT A**

**BlueCrest USA GP, LLC**
**(as general partner to BlueCrest Capital Management (New York) LP)**
**615 South DuPont Highway**
**Dover, Delaware 19901 USA**

_**Personal and Confidential**_

31 October 2013

Nicholas O'Grady
36 Brushy Ridge Road
New Canaan
CT
06840

Re:   <u>Offer of Employment</u>

Dear Nicholas:

1.      On behalf of BlueCrest USA GP, LLC, (the "Company"), I am pleased to confirm your offer of employment with the Company as a Portfolio Manager.  This letter agreement (the "Agreement") sets forth the terms and conditions of your employment with the Company.  In relation to your role as a Portfolio Manager, you must fulfill and hereby agree to all compliance requirements and requests as and when they may be made by the Company.

2.      Your starting annual base salary will be $250,000 per annum, less applicable state and federal withholding and other lawful deductions and is payable pro rata on the Company's regular pay days, which initially shall be on a semi-monthly basis.  Your annual base salary, as in effect from time to time, is hereinafter referred to as the "Base Salary".

3.      You will be eligible to participate in any bonus programs the Company may decide to establish from time to time to cover employees similarly situated to you, subject to the provisions of the applicable bonus program.  Any bonus program established and awards made pursuant thereto by the Company will be subject to the Company's sole and absolute discretion. Any bonus payable shall be paid less any applicable state and federal withholding and other lawful deductions. You will not be eligible to be paid any bonus if at any time prior to the date of any payment you have provided the Company with notice of your intent to terminate your employment, or if your employment has been terminated.

4.      You and the Company (each a "Party" and together the "Parties") agree that you will be employed by the Company beginning on a date to be agreed in writing and ending on the date of termination of your employment, pursuant to Paragraph 5 below (the "Term"), on the terms and subject to the conditions set forth in this Agreement.

5.   <u>Termination of Employment</u>

5.1   <u>Voluntary Termination</u>: You may voluntarily terminate your employment at any time upon three month's prior written notice to the Company.

5.2   <u>Termination for Cause</u>: Your employment may be terminated for "Cause". Such termination for "Cause" shall be effective immediately (or on such other date set forth by the Company). For the purposes of this Agreement, "Cause" includes but is not limited to each of the following, as determined by the Company:

(i)   your commission of a felony or crime involving moral turpitude or immoral or unethical conduct;

(ii)   conduct by you in connection with your employment duties or responsibilities that is fraudulent, unlawful or negligent;

(iii)   your willful misconduct;

(iv)   your contravention of specific lawful directions related to a material duty or responsibility;

(v)   your breach of your obligations under this Agreement;

(vi)   any acts of dishonesty by you resulting or intending to result in personal gain or enrichment at the expense of the Company, its subsidiaries or affiliates;

(vii)   your failure to comply with any policy or guidelines or procedures of the Company, its subsidiaries or affiliates, as identified to you from time to time; or

(viii)   your engaging in personal conduct (including, but not limited to harassment or discrimination of employees, or the use or possession at work of any illegal controlled substance) which discredits or damages, or could discredit or damage, the Company, its subsidiaries or affiliates.

(ix)   your breach of any 'stop loss' limits, as communicated to you by the Company from time to time.

5.3   <u>Termination without Cause</u>:   The Company may terminate your employment without Cause upon one month prior written notice to you.

5.4   In the event that your employment terminates pursuant to Paragraphs 5.1 or 5.3, you will be entitled to receive your Base Salary and any employee benefits that you are entitled to receive pursuant to the employee benefit plans of the Company established for employees similarly situated to you as provided in Paragraph 7 below, in accordance with the terms of such employee benefit plans accrued, but unpaid, through your termination date. In the event of such termination, and in lieu of any notice required, the Company may, in its absolute discretion, terminate your employment immediately (or at any time during the notice period) and make a lump sum payment equivalent to your Base Salary through the end of the notice period and provide you with any relevant employee benefits to which you would have otherwise been entitled during the period of notice, provided that you execute a valid and irrevocable release agreement in a form acceptable to the Company.

5.5     Termination upon Death or Incapacity:  In the event that your employment with the Company terminates due to your death or Incapacity, you, or your legal representative, will be entitled to receive your Base Salary and any employee benefits that you are entitled to receive pursuant to the employee benefit plans of the Company in accordance with the terms of such employee benefit plans accrued, but unpaid, through your termination date.

For the purposes of this Agreement, "Incapacity" means a determination by the Company in accordance with applicable law that as a result of a physical or mental injury or illness, you are unable to perform the essential functions of your job with or without reasonable accommodation for a period of (a) 90 consecutive days; or (b) 120 days in any 12 month period.

6.     Your normal working hours will be determined based upon prior agreement with your immediate supervisor.  The Company may modify your work schedule from time to time and when this is necessitated, you will be provided with advance notice of the schedule that will be required of you.

7.     You will be eligible for vacation, holidays, sick leave and other employee benefits on the same basis as other comparable-level Company employees, as such programs are established, modified, and/or eliminated by the Company from time to time. Your vacation allowance will be 20 days per annum.  As is generally the case with respect to all of the Company's Portfolio Managers, you will be eligible to participate in any health insurance program, life insurance program or other employee benefit programs as may be established by the Company from time to time however you will be responsible for the cost to the Company of your participation in such program(s).

8.     As a condition of your employment, you agree that you will abide by all Company personnel policies and practices (as may be amended in the Company's sole discretion).

9.     In accordance with Company policies and state and federal law, this offer of employment is contingent upon your successful completion of all requirements to establish the legal right to work in the United States.

10.     Your employment is also contingent upon satisfactory background and/or reference checks as well as the satisfactory outcome of a drugs test.

11.     Except as required in the performance of your duties, you will not at any time during or after your employment, directly or indirectly use, disclose, or disseminate any of the Company's Confidential Business Information. "Confidential Business Information" includes all non-public information concerning the operations, systems, clients, investors, strategies, services, marketing, business plans, methods, procedures personnel, financial affairs, investments, and trading philosophies, strategies, and/or techniques of the Company or Group Companies (as defined below) or any other information of a secret, proprietary, confidential, or generally undisclosed nature relating to the Company or the Group Companies.  Confidential Business Information also shall include (a) computer software, forms, contracts, agreements, literature, and/or other documents designed, developed, or written by, for, with, or on behalf of

any of the Company or the Group Companies or any of their clients or investors; (b) and the identity of any clients or investors or the investments or positions of any such clients or investors, and/or (c) information about any client advised by the Company or group companies. You agree to deliver to the Company any and all copies of Confidential Business Information, or other Company property, in your possession or control upon the termination of your employment, or at any other time at the request of the Company.

12.    You agree that you will not, during your employment with the Company, improperly use or disclose any proprietary or confidential information or trade secrets of any former employer or other person or entity, and that you will not bring onto the premises of the Company any unpublished documents or proprietary or confidential information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity. Furthermore, you confirm that you are not currently bound by any restrictions imposed by any former employer, including but not limited to, any non-competition or non-solicitation agreements.

13.    You agree that you will not at any time make, publish, or communicate to any person or entity, including but not limited to the clients, investors, and employees of the Company or Group Companies, any Disparaging remarks, comments, or statements concerning the Company or the Group Companies or any of their clients, investors, employees, or agents. "Disparaging" remarks, comments, or statements are those that impugn, criticize, or denigrate (a) the Company or the Group Companies or any of their clients, investors, employees, or agents and/or (b) the character, honesty, integrity, morality, business acumen, or abilities of the Company or the Group Companies, or any of their clients, investors, employees, or agents.

14.    For the purposes of this clause 14:-

(A)    "Investor" means any person who, at the Termination Date or at any time during the Relevant Period was a prospective investor in any current or future collective investment scheme then managed or operated by the Company or any Group Company or is a person whose investment portfolio or assets are managed by the Company or a Group Company and with whom during the same period prior to the Termination Date you shall have had business dealings.

(B)    "Prospective Investor" means any person who, on the Termination Date, or at any time during the Relevant Period is or was a prospective investor in any current or future collective investment scheme managed or operated by the Company or any Group Company or whose investment portfolio or assets the Company or any Group Company proposed to manage and with whom during the Relevant Period:

(1)    the Company or any Group Company had discussions or negotiations concerning such proposed investment or management; and

(2)    you had business dealings.

(C)    "Key Employee" shall mean any person who is and was, at any time during the Relevant Period:-

(1)    a director of the Company or any Group Company;

(2) an employee employed or a consultant or other independent contractor retained or engaged by the Company on the Trading or Research Teams; or

(3) an employee employed or a consultant or other independent contractor retained or engaged by the Company or any Group Company at a salary, retainer or fee at a rate of $100,000 or more per annum and who, by reason of such employment or engagement, possesses confidential information relating to the business of the Company or any Group Company the use or disclosure of which would be likely to assist any competitor of the Company or any Group Company or who is likely to be able to solicit the custom of any Investor or Prospective Investor for funds in competition with funds managed by the Company or any Group Company or to induce any Investor to cease dealing or to reduce such Investor's dealings with funds managed by the Company or any Group Company.

(D) **"Relevant Business"** shall mean any business carried on by the Company or any Group Company at the Termination Date and with which you were actively involved in the course of your employment during the Relevant Period.

(E) **"Relevant Period"** shall mean the period of 12 months ending on the Termination Date.

(F) **"Termination Date"** shall mean the date of termination of your employment or of this Contract for any reason.

14.1 Non-Solicitation of Investors or Prospective Investors:  You covenant with the Company that you shall not for a period of 12 months after the Termination Date either on your own account or for or on behalf of any other person in competition with any Relevant Business directly or indirectly:-

(A) endeavour to entice away from the Company or any Group Company or canvass or solicit business or customer from any Investor or Prospective Investor with whom you had personal contact in the course of your employment during the Relevant Period; or

(B) accept or facilitate the acceptance of orders or instructions from or deal with any such Investor or Prospective Investor.

14.2 Non-Solicitation of Key Employees:  You further covenant with the Company that you shall not for a period of 12 months after the Termination Date either on your own account or for or on behalf of any other person directly or indirectly solicit the employment or engagement of or interfere with or endeavour to entice away from the Company or any Group Company so as to obtain the employment or engagement of any Key Employee.

You further covenant with the Company that you shall not during the Term and for a period of 12 months after the Termination Date either on your own account or for or on behalf of any other person directly or indirectly accept into employment, employ or

otherwise retain, engage or use the services of any Key Employee.

14.3    Non-Competition: You further covenant with the Company that you shall not for a period of 3 months after the Termination Date be engaged, concerned or interested, either directly or indirectly in any capacity in any trade or business or occupation whatsoever, which would compete with the Relevant Business.

You acknowledge and agree that the Company is a global business primarily engaged in providing services and trading across global markets, and that, accordingly, the foregoing restriction is reasonable and necessary for the protection of the Company and the Group Companies.

14.4    Without prejudice to clauses 14.1, 14.2, and 14.3 above, you further covenant with the Company that you shall not during the Term and for a period of 6 months after the Termination Date either on your own account or for or on behalf of any other person directly or indirectly induce or attempt to induce any consultant retained or engaged by or any supplier of the Company or any Group Company with whom you had dealings in the course of your employment during the Relevant Period to cease to provide consultancy services to or supply, or to restrict or vary the terms of retainer or engagement by or supply to, the Company or any Group Company or otherwise interfere with the relationship between such a consultant or supplier and the Company or any Group Company.

14.5    If you receive any offer of employment (whether oral or in writing and whether accepted or not) from any person either during the continuance of this Agreement or during the continuance in force of all or any of the restrictions in this paragraph 14, you shall immediately inform the Company of the identity of the offeror and its terms. Without prejudice to your obligations in relation to confidentiality, you will provide the offeror details of the substance of the restrictions contained in this paragraph 14.

14.6    The period of restriction specified in clause 14.3 above shall be reduced by the duration of any period immediately prior to the date of termination during which the Company suspends you from performance of your duties.

15.     Intellectual Property. The term "Intellectual Property" means all intellectual and industrial property and all rights therein including, without limiting the generality of the foregoing, all inventions (whether patentable or not, and whether or not patent protection has been applied for or granted), improvements, developments, discoveries, proprietary information, trade marks, trade mark applications, trade names, websites, Internet domain names, logos, art work, slogans, know-how, technical information, trade secrets, processes, designs (whether or not registrable and whether or not design rights subsist in them), utility models, works in which copyright may subsist (including computer software and preparatory and design materials therefor), topography rights and all works protected by rights or forms of protection of a similar nature or having equivalent effect anywhere in the world.

         Any and all Intellectual Property relating to the Company's or any Group Company's business (whether or not patentable), discovered, developed, or learned by you in the course of, or in connection with, your employment under this Agreement are the sole and

absolute property of the Company (including, but not limited to, as "works made for hire") under The Patents Act 1977, the Registered Designs Act 1949, and the Copyright Designs and Patents Act 1988 of the United Kingdom, the copyright laws of the United States, and under similar laws of other jurisdictions (collectively, the "Intellectual Property Laws"). The Company is the sole and absolute owner of all patents, copyrights, trademarks, and other property rights to the Intellectual Property and you waive unconditionally and irrevocably all present and future moral rights which you have or may have to the Intellectual Property arising under the Intellectual Property Laws, and agree not to support, maintain, nor permit any claim for infringement of moral rights in such copyright works.  If at any time you make or discover or participate in the making or discovery of any Intellectual Property directly or indirectly relating to or capable of being used in the business carried on by the Company or by any Group Company, full details of the Intellectual Property shall immediately be disclosed in writing by you to the Company.  You shall give and supply all such information, data, drawings, and other assistance as requested by the Company to enable the Company to exploit the Intellectual Property to the best advantage (as decided by the Company), and shall execute all documents and do all things which may be necessary or in the opinion of the Company desirable for obtaining patent or other protection for the Intellectual Property in such parts of the world as may be specified by the Company and for vesting the same in the Company or as it may direct.  You have been notified by the Company and understand that the foregoing provisions of this clause do not apply to Intellectual Property for which no equipment, supplies, facilities, confidential, proprietary, or trade secret information of the Company or any Group Company was used and which was developed entirely on your own time, unless the invention (a) relates to the business of the Company or to that of any Group Company or to their actual or demonstrably anticipated research and development, or (b) results from any work performed by you for the Company or for any Group Company.

16.     You hereby acknowledge that the provisions of Paragraphs 11, 12, 13, 14 and 15 of this Agreement are reasonable and necessary for the protection of the Company and the Group Companies.  You also agree that the services you provide the Company are of a unique, special, and extraordinary nature.  The Parties acknowledge and agree that your breach or threatened breach of any of the restrictions set forth in Paragraphs 11, 12, 13, 14 and 15, will result in irreparable and continuing damage to the Company for which there may be no adequate remedy at law and that the Company shall be entitled to seek equitable relief, including specific performance and injunctive relief as remedies for any such breach or threatened or attempted breach, without requiring the posting of a bond.  You hereby consent to the grant of an injunction (temporary or otherwise) against you or the entry of any other court order against you prohibiting and enjoining you from violating, or directing you to comply with, any provision of this Agreement.  You also agree that such remedies shall be in addition to any and all remedies, including damages, available to the Company against you for such breaches or threatened or attempted breaches.

17.     This Agreement shall be governed and construed in accordance with the laws of the State of Delaware without reference to its conflict of laws principles.  Any action or proceeding with respect to this Agreement shall be brought and maintained exclusively in the Supreme Court of the State of New York, County of New York or in the United States District Court for the Southern District of New York, and the parties hereby consent to the jurisdiction of such courts with respect to the subject matter herein.

18. Other than disputes involving the covenants and obligations set forth in Paragraphs 11-14 above which may be directly filed in a court of law, you and the Company agree that all other disputes and claims of any nature that you may have against the Company including, but not limited to, all statutory, contractual, and common law claims (including all employment discrimination claims), will be submitted exclusively first to mandatory mediation in New York, New York, or at another mutually agreed-upon location, under the rules of Judicial Arbitration and Mediation Services ("JAMS") or under such other rules or under the auspices of such other organization as the parties may mutually agree. All information regarding the dispute or claim or mediation proceedings, including any mediation settlement, shall not be disclosed by you, the Company, or any mediator to any third party without the written consent of the Company's General Counsel and you. In the event that mediation fails to resolve any dispute that you have with the Company and you proceed to file a complaint in court, you hereby waive any right to a jury trial of that dispute.

19.    The Company is authorized to withhold from any benefit provided or payment due hereunder, the amount of withholding taxes due any federal, state or local authority in respect of such benefit or payment and to take such other action as may be necessary in the opinion of the Company to satisfy all obligations for the payment of such withholding taxes.

20.    The failure by you or the Company to insist upon strict compliance with any provision of this Agreement or the failure to assert any right you or the Company may have hereunder, shall not be deemed to be a waiver of such provision or such right or any other provision or right under this Agreement.

21.    This Agreement sets forth the sole and entire understanding between you and the Company with respect to the subject of your employment and supersedes all prior or contemporaneous understandings, agreements or negotiations on that subject. You acknowledge and agree that the Company has made no representations to you regarding the kind, character or existence of work or the compensation that you will receive for such work other than as set forth in this Agreement.

22.    This Agreement may be amended or modified only by a written instrument signed by both Parties.

23.    The Parties hereby agree that each of the provisions of this Agreement shall be construed separately and independently, and if one or more of the provisions is found to be void or unenforceable by a Court of competent jurisdiction, the validity of the remaining provisions shall not be affected. With respect to Paragraphs 11, 12, 13 and 14, the parties shall negotiate in good faith to replace such void or unenforceable restriction with a valid restriction which, to the extent possible, has the same legal and commercial effect as that which it replaces.

Please acknowledge your acceptance of this offer of employment, and the provisions set forth above defining the terms and conditions of your employment, by signing this Agreement and returning it to me.  We look forward to your starting work at BlueCrest Capital Management (New York) LP.

Sincerely,

**For and on behalf of**
**BlueCrest USA GP, LLC,**
**acting as general partner to BlueCrest Capital Management (New York) LP**

Enclosure

I HEREBY ACCEPT BLUECREST CAPITAL MANAGEMENT (NEW YORK) LP'S OFFER OF EMPLOYMENT UPON THE TERMS AND CONDITIONS SET FORTH ABOVE.

Nicholas O'Grady
Date: 11 | 7 | 2013

**EXHIBIT B**

# BlueCrest

BlueCrest Capital Management (UK) LLP

# *Equities* Compensation Model – Illustrative Guidelines

**Name:** Nicholas O'Grady
**Equity Model Example:** assumes 1 Portfolio Manager and 2 Analysts
**Team structure to be approved in advance**

| | | | $ |
|---|---|---|---|
| **Portfolio Manager P&L** | | | $20,000,000 |
| Less Direct Costs e.g.: | | | |
| Brokerage & Trading Costs | | | ($100,000) |
| Financing/Prime Brokerage costs | | | ($500,000) |
| External Research Services | | | ($20,000) | To be approved in advance |
| Bloomberg Terminals | (3 terminals) | | ($60,000) | Bloomberg terminal for Analysts to be approved in advance |
| IT Infrastructure | | | | |
| Front Arena | (1 licence) | | ($11,500) | 1 Front Arena Licence per Portfolio Manager |
| Business Travel and Accommodation (50% capped at $15k) | | | ($10,000) | Portfolio Manager allowance split 50/50 gross and net cost deduction / Gross deduction capped at $15k with excess being a net deduction |
| **Net Portfolio Manager P&L** | | | **$19,298,500** |
| | | 18% | $3,473,730 |

| | | | |
|---|---|---|---|
| **Less other costs e.g.:** | | | |
| Portfolio Manager Gross Salary & Benefits | | | ($250,000) | Includes base salary ; any pension ; BUPA ; other benefits |
| Analysts Gross Salary, Bonus & Benefits | | | ($400,000) | Includes base salary ; bonus ; any pension ; BUPA ; other benefits |
| Employer's Social Security / National Insurance | | | ($80,000) | |
| Recruitment Fees and related expenses (for team hires) | | | ($40,000) | e.g. Recruitment fee for Analyst |
| Other direct expenditure related to team joiners / leavers | | | ($5,000) | e.g. visas ; legal advice ; costs of departures / severance |
| Relocation | | | ($10,000) | |
| Bloomberg Realtime | (3 feeds) | | ($15,000) | |
| Quant Research & Development (%age share based upon usage) | | | - | Methodology and %age share to be approved in advance |
| Non Standard IT | e.g. Servers | | - | Negotiated on a case by case basis |
| Non Standard IT | e.g. extra Front Arena Licence | | - | Negotiated on a case by case basis |
| Non Standard Market Data | e.g. MSCI | | - | Negotiated on a case by case basis |
| Travel, Accommodation and Entertaining (50% plus 100% over $30k) | | | ($10,000) | 50% of travel up to $30k total, 100% over $30k |
| Other direct expenditure | e.g. legal/tax advice ,subscriptions | | ($1,000) | |
| **Net Award** | | | **$2,662,730** |

No reliance should be placed on any information or representation contained within this document, which is by way of example only and no liability of any type will be incurred with regard to such information or representation by either BlueCrest Capital Management BY LP or any member of the BlueCrest group of entities or any of its or their officers or employees. The information set out in this document is illustrative only and is based on various assumptions which may not be borne out or which may be superseded. The rights of all employees, members or partners of any BlueCrest entity (including but not limited to those with regard to any future profit allocations and/or discretionary drawings) will remain at all times strictly subject to review and approval in accordance with the terms of the applicable employment agreement or partnership agreement, each which has neither been varied nor modified by anything set out herein.

2