# Exhibit 1

**BlueCrest USA GP, LLC**
**(as general partner to BlueCrest Capital Management (New York) LP)**
**615 South DuPont Highway**
**Dover, Delaware 19901 USA**

*Personal and Confidential*

31 October 2013

Nicholas O'Grady
36 Brushy Ridge Road
New Canaan
CT
06840

      Re:    **Offer of Employment**

Dear Nicholas:

      1.    On behalf of BlueCrest USA GP, LLC, (the "Company"), I am pleased to confirm your offer of employment with the Company as a Portfolio Manager. This letter agreement (the "Agreement") sets forth the terms and conditions of your employment with the Company. In relation to your role as a Portfolio Manager, you must fulfill and hereby agree to all compliance requirements and requests as and when they may be made by the Company.

      2.    Your starting annual base salary will be $250,000 per annum, less applicable state and federal withholding and other lawful deductions and is payable pro rata on the Company's regular pay days, which initially shall be on a semi-monthly basis. Your annual base salary, as in effect from time to time, is hereinafter referred to as the "Base Salary".

      3.    You will be eligible to participate in any bonus programs the Company may decide to establish from time to time to cover employees similarly situated to you, subject to the provisions of the applicable bonus program. Any bonus program established and awards made pursuant thereto by the Company will be subject to the Company's sole and absolute discretion. Any bonus payable shall be paid less any applicable state and federal withholding and other lawful deductions. You will not be eligible to be paid any bonus if at any time prior to the date of any payment you have provided the Company with notice of your intent to terminate your employment, or if your employment has been terminated.

      4.    You and the Company (each a "Party" and together the "Parties") agree that you will be employed by the Company beginning on a date to be agreed in writing and ending on the date of termination of your employment, pursuant to Paragraph 5 below (the "Term"), on the terms and subject to the conditions set forth in this Agreement.

5. <u>Termination of Employment</u>

5.1  <u>Voluntary Termination</u>: You may voluntarily terminate your employment at any time upon three month's prior written notice to the Company.

5.2  <u>Termination for Cause</u>: Your employment may be terminated for "Cause". Such termination for "Cause" shall be effective immediately (or on such other date set forth by the Company). For the purposes of this Agreement, "Cause" includes but is not limited to each of the following, as determined by the Company:

- (i) your commission of a felony or crime involving moral turpitude or immoral or unethical conduct;
- (ii) conduct by you in connection with your employment duties or responsibilities that is fraudulent, unlawful or negligent;
- (iii) your willful misconduct;
- (iv) your contravention of specific lawful directions related to a material duty or responsibility;
- (v) your breach of your obligations under this Agreement;
- (vi) any acts of dishonesty by you resulting or intending to result in personal gain or enrichment at the expense of the Company, its subsidiaries or affiliates;
- (vii) your failure to comply with any policy or guidelines or procedures of the Company, its subsidiaries or affiliates, as identified to you from time to time; or
- (viii) your engaging in personal conduct (including, but not limited to harassment or discrimination of employees, or the use or possession at work of any illegal controlled substance) which discredits or damages, or could discredit or damage, the Company, its subsidiaries or affiliates.
- (ix) your breach of any 'stop loss' limits, as communicated to you by the Company from time to time.

5.3  <u>Termination without Cause:</u> The Company may terminate your employment without Cause upon one month prior written notice to you.

5.4  In the event that your employment terminates pursuant to Paragraphs 5.1 or 5.3, you will be entitled to receive your Base Salary and any employee benefits that you are entitled to receive pursuant to the employee benefit plans of the Company established for employees similarly situated to you as provided in Paragraph 7 below, in accordance with the terms of such employee benefit plans accrued, but unpaid, through your termination date. In the event of such termination, and in lieu of any notice required, the Company may, in its absolute discretion, terminate your employment immediately (or at any time during the notice period) and make a lump sum payment equivalent to your Base Salary through the end of the notice period and provide you with any relevant employee benefits to which you would have otherwise been entitled during the period of notice, provided that you execute a valid and irrevocable release agreement in a form acceptable to the Company.

5.5 Termination upon Death or Incapacity: In the event that your employment with the Company terminates due to your death or Incapacity, you, or your legal representative, will be entitled to receive your Base Salary and any employee benefits that you are entitled to receive pursuant to the employee benefit plans of the Company in accordance with the terms of such employee benefit plans accrued, but unpaid, through your termination date.

For the purposes of this Agreement, "Incapacity" means a determination by the Company in accordance with applicable law that as a result of a physical or mental injury or illness, you are unable to perform the essential functions of your job with or without reasonable accommodation for a period of (a) 90 consecutive days; or (b) 120 days in any 12 month period.

6. Your normal working hours will be determined based upon prior agreement with your immediate supervisor. The Company may modify your work schedule from time to time and when this is necessitated, you will be provided with advance notice of the schedule that will be required of you.

7. You will be eligible for vacation, holidays, sick leave and other employee benefits on the same basis as other comparable-level Company employees, as such programs are established, modified, and/or eliminated by the Company from time to time. Your vacation allowance will be 20 days per annum. As is generally the case with respect to all of the Company's Portfolio Managers, you will be eligible to participate in any health insurance program, life insurance program or other employee benefit programs as may be established by the Company from time to time however you will be responsible for the cost to the Company of your participation in such program(s).

8. As a condition of your employment, you agree that you will abide by all Company personnel policies and practices (as may be amended in the Company's sole discretion).

9. In accordance with Company policies and state and federal law, this offer of employment is contingent upon your successful completion of all requirements to establish the legal right to work in the United States.

10. Your employment is also contingent upon satisfactory background and/or reference checks as well as the satisfactory outcome of a drugs test.

11. Except as required in the performance of your duties, you will not at any time during or after your employment, directly or indirectly use, disclose, or disseminate any of the Company's Confidential Business Information. "Confidential Business Information" includes all non-public information concerning the operations, systems, clients, investors, strategies, services, marketing, business plans, methods, procedures personnel, financial affairs, investments, and trading philosophies, strategies, and/or techniques of the Company or Group Companies (as defined below) or any other information of a secret, proprietary, confidential, or generally undisclosed nature relating to the Company or the Group Companies. Confidential Business Information also shall include (a) computer software, forms, contracts, agreements, literature, and/or other documents designed, developed, or written by, for, with, or on behalf of

any of the Company or the Group Companies or any of their clients or investors; (b) and the identity of any clients or investors or the investments or positions of any such clients or investors, and/or (c) information about any client advised by the Company or group companies. You agree to deliver to the Company any and all copies of Confidential Business Information, or other Company property, in your possession or control upon the termination of your employment, or at any other time at the request of the Company.

12. You agree that you will not, during your employment with the Company, improperly use or disclose any proprietary or confidential information or trade secrets of any former employer or other person or entity, and that you will not bring onto the premises of the Company any unpublished documents or proprietary or confidential information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity. Furthermore, you confirm that you are not currently bound by any restrictions imposed by any former employer, including but not limited to, any non-competition or non-solicitation agreements.

13. You agree that you will not at any time make, publish, or communicate to any person or entity, including but not limited to the clients, investors, and employees of the Company or Group Companies, any Disparaging remarks, comments, or statements concerning the Company or the Group Companies or any of their clients, investors, employees, or agents. "Disparaging" remarks, comments, or statements are those that impugn, criticize, or denigrate (a) the Company or the Group Companies or any of their clients, investors, employees, or agents and/or (b) the character, honesty, integrity, morality, business acumen, or abilities of the Company or the Group Companies, or any of their clients, investors, employees, or agents.

14. For the purposes of this clause 14:-

(A) "**Investor**" means any person who, at the Termination Date or at any time during the Relevant Period was a prospective investor in any current or future collective investment scheme then managed or operated by the Company or any Group Company or is a person whose investment portfolio or assets are managed by the Company or a Group Company and with whom during the same period prior to the Termination Date you shall have had business dealings.

(B) "**Prospective Investor**" means any person who, on the Termination Date, or at any time during the Relevant Period is or was a prospective investor in any current or future collective investment scheme managed or operated by the Company or any Group Company or whose investment portfolio or assets the Company or any Group Company proposed to manage and with whom during the Relevant Period:

(1) the Company or any Group Company had discussions or negotiations concerning such proposed investment or management; and

(2) you had business dealings.

(C) "**Key Employee**" shall mean any person who is and was, at any time during the Relevant Period:-

(1) a director of the Company or any Group Company;

(2) an employee employed or a consultant or other independent contractor retained or engaged by the Company on the Trading or Research Teams; or

(3) an employee employed or a consultant or other independent contractor retained or engaged by the Company or any Group Company at a salary, retainer or fee at a rate of $100,000 or more per annum and who, by reason of such employment or engagement, possesses confidential information relating to the business of the Company or any Group Company the use or disclosure of which would be likely to assist any competitor of the Company or any Group Company or who is likely to be able to solicit the custom of any Investor or Prospective Investor for funds in competition with funds managed by the Company or any Group Company or to induce any Investor to cease dealing or to reduce such Investor's dealings with funds managed by the Company or any Group Company.

(D) **"Relevant Business"** shall mean any business carried on by the Company or any Group Company at the Termination Date and with which you were actively involved in the course of your employment during the Relevant Period.

(E) **"Relevant Period"** shall mean the period of 12 months ending on the Termination Date.

(F) **"Termination Date"** shall mean the date of termination of your employment or of this Contract for any reason.

14.1 Non-Solicitation of Investors or Prospective Investors: You covenant with the Company that you shall not for a period of 12 months after the Termination Date either on your own account or for or on behalf of any other person in competition with any Relevant Business directly or indirectly:-

(A) endeavour to entice away from the Company or any Group Company or canvass or solicit business or customer from any Investor or Prospective Investor with whom you had personal contact in the course of your employment during the Relevant Period; or

(B) accept or facilitate the acceptance of orders or instructions from or deal with any such Investor or Prospective Investor.

14.2 Non-Solicitation of Key Employees: You further covenant with the Company that you shall not for a period of 12 months after the Termination Date either on your own account or for or on behalf of any other person directly or indirectly solicit the employment or engagement of or interfere with or endeavour to entice away from the Company or any Group Company so as to obtain the employment or engagement of any Key Employee.

You further covenant with the Company that you shall not during the Term and for a period of 12 months after the Termination Date either on your own account or for or on behalf of any other person directly or indirectly accept into employment, employ or

otherwise retain, engage or use the services of any Key Employee.

14.3 Non-Competition: You further covenant with the Company that you shall not for a period of 3 months after the Termination Date be engaged, concerned or interested, either directly or indirectly in any capacity in any trade or business or occupation whatsoever, which would compete with the Relevant Business.

You acknowledge and agree that the Company is a global business primarily engaged in providing services and trading across global markets, and that, accordingly, the foregoing restriction is reasonable and necessary for the protection of the Company and the Group Companies.

14.4 Without prejudice to clauses 14.1, 14.2, and 14.3 above, you further covenant with the Company that you shall not during the Term and for a period of 6 months after the Termination Date either on your own account or for or on behalf of any other person directly or indirectly induce or attempt to induce any consultant retained or engaged by or any supplier of the Company or any Group Company with whom you had dealings in the course of your employment during the Relevant Period to cease to provide consultancy services to or supply, or to restrict or vary the terms of retainer or engagement by or supply to, the Company or any Group Company or otherwise interfere with the relationship between such a consultant or supplier and the Company or any Group Company.

14.5 If you receive any offer of employment (whether oral or in writing and whether accepted or not) from any person either during the continuance of this Agreement or during the continuance in force of all or any of the restrictions in this paragraph 14, you shall immediately inform the Company of the identity of the offeror and its terms. Without prejudice to your obligations in relation to confidentiality, you will provide the offeror details of the substance of the restrictions contained in this paragraph 14.

14.6 The period of restriction specified in clause 14.3 above shall be reduced by the duration of any period immediately prior to the date of termination during which the Company suspends you from performance of your duties.

15. Intellectual Property. The term "Intellectual Property" means all intellectual and industrial property and all rights therein including, without limiting the generality of the foregoing, all inventions (whether patentable or not, and whether or not patent protection has been applied for or granted), improvements, developments, discoveries, proprietary information, trade marks, trade mark applications, trade names, websites, Internet domain names, logos, art work, slogans, know-how, technical information, trade secrets, processes, designs (whether or not registrable and whether or not design rights subsist in them), utility models, works in which copyright may subsist (including computer software and preparatory and design materials therefor), topography rights and all works protected by rights or forms of protection of a similar nature or having equivalent effect anywhere in the world.

Any and all Intellectual Property relating to the Company's or any Group Company's business (whether or not patentable), discovered, developed, or learned by you in the course of, or in connection with, your employment under this Agreement are the sole and

absolute property of the Company (including, but not limited to, as "works made for hire") under The Patents Act 1977, the Registered Designs Act 1949, and the Copyright Designs and Patents Act 1988 of the United Kingdom, the copyright laws of the United States, and under similar laws of other jurisdictions (collectively, the "Intellectual Property Laws"). The Company is the sole and absolute owner of all patents, copyrights, trademarks, and other property rights to the Intellectual Property and you waive unconditionally and irrevocably all present and future moral rights which you have or may have to the Intellectual Property arising under the Intellectual Property Laws, and agree not to support, maintain, nor permit any claim for infringement of moral rights in such copyright works. If at any time you make or discover or participate in the making or discovery of any Intellectual Property directly or indirectly relating to or capable of being used in the business carried on by the Company or by any Group Company, full details of the Intellectual Property shall immediately be disclosed in writing by you to the Company. You shall give and supply all such information, data, drawings, and other assistance as requested by the Company to enable the Company to exploit the Intellectual Property to the best advantage (as decided by the Company), and shall execute all documents and do all things which may be necessary or in the opinion of the Company desirable for obtaining patent or other protection for the Intellectual Property in such parts of the world as may be specified by the Company and for vesting the same in the Company or as it may direct. You have been notified by the Company and understand that the foregoing provisions of this clause do not apply to Intellectual Property for which no equipment, supplies, facilities, confidential, proprietary, or trade secret information of the Company or any Group Company was used and which was developed entirely on your own time, unless the invention (a) relates to the business of the Company or to that of any Group Company or to their actual or demonstrably anticipated research and development, or (b) results from any work performed by you for the Company or for any Group Company.

16. You hereby acknowledge that the provisions of Paragraphs 11, 12, 13, 14 and 15 of this Agreement are reasonable and necessary for the protection of the Company and the Group Companies. You also agree that the services you provide the Company are of a unique, special, and extraordinary nature. The Parties acknowledge and agree that your breach or threatened breach of any of the restrictions set forth in Paragraphs 11, 12, 13, 14 and 15, will result in irreparable and continuing damage to the Company for which there may be no adequate remedy at law and that the Company shall be entitled to seek equitable relief, including specific performance and injunctive relief as remedies for any such breach or threatened or attempted breach, without requiring the posting of a bond. You hereby consent to the grant of an injunction (temporary or otherwise) against you or the entry of any other court order against you prohibiting and enjoining you from violating, or directing you to comply with, any provision of this Agreement. You also agree that such remedies shall be in addition to any and all remedies, including damages, available to the Company against you for such breaches or threatened or attempted breaches.

17. This Agreement shall be governed and construed in accordance with the laws of the State of Delaware without reference to its conflict of laws principles. Any action or proceeding with respect to this Agreement shall be brought and maintained exclusively in the Supreme Court of the State of New York, County of New York or in the United States District Court for the Southern District of New York, and the parties hereby consent to the jurisdiction of such courts with respect to the subject matter herein.

18. Other than disputes involving the covenants and obligations set forth in Paragraphs 11-14 above which may be directly filed in a court of law, you and the Company agree that all other disputes and claims of any nature that you may have against the Company including, but not limited to, all statutory, contractual, and common law claims (including all employment discrimination claims), will be submitted exclusively first to mandatory mediation in New York, New York, or at another mutually agreed-upon location, under the rules of Judicial Arbitration and Mediation Services ("JAMS") or under such other rules or under the auspices of such other organization as the parties may mutually agree. All information regarding the dispute or claim or mediation proceedings, including any mediation settlement, shall not be disclosed by you, the Company, or any mediator to any third party without the written consent of the Company's General Counsel and you. In the event that mediation fails to resolve any dispute that you have with the Company and you proceed to file a complaint in court, you hereby waive any right to a jury trial of that dispute.

19. The Company is authorized to withhold from any benefit provided or payment due hereunder, the amount of withholding taxes due any federal, state or local authority in respect of such benefit or payment and to take such other action as may be necessary in the opinion of the Company to satisfy all obligations for the payment of such withholding taxes.

20. The failure by you or the Company to insist upon strict compliance with any provision of this Agreement or the failure to assert any right you or the Company may have hereunder, shall not be deemed to be a waiver of such provision or such right or any other provision or right under this Agreement.

21. This Agreement sets forth the sole and entire understanding between you and the Company with respect to the subject of your employment and supersedes all prior or contemporaneous understandings, agreements or negotiations on that subject. You acknowledge and agree that the Company has made no representations to you regarding the kind, character or existence of work or the compensation that you will receive for such work other than as set forth in this Agreement.

22. This Agreement may be amended or modified only by a written instrument signed by both Parties.

23. The Parties hereby agree that each of the provisions of this Agreement shall be construed separately and independently, and if one or more of the provisions is found to be void or unenforceable by a Court of competent jurisdiction, the validity of the remaining provisions shall not be affected. With respect to Paragraphs 11, 12, 13 and 14, the parties shall negotiate in good faith to replace such void or unenforceable restriction with a valid restriction which, to the extent possible, has the same legal and commercial effect as that which it replaces.

Please acknowledge your acceptance of this offer of employment, and the provisions set forth above defining the terms and conditions of your employment, by signing this Agreement and returning it to me. We look forward to your starting work at BlueCrest Capital Management (New York) LP.

Sincerely,

For and on behalf of
BlueCrest USA GP, LLC,
acting as general partner to BlueCrest Capital Management (New York) LP

Enclosure

I HEREBY ACCEPT BLUECREST CAPITAL MANAGEMENT (NEW YORK) LP'S OFFER OF EMPLOYMENT UPON THE TERMS AND CONDITIONS SET FORTH ABOVE.

Nicholas O'Grady
Date: 11/7/2013